1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JENNIFER CARRERA, et al.,

            Plaintiffs,

    v.

WHITEPAGES, INC.,

            Defendant.

CASE NO. 2:24-cv-01408-JHC

ORDER DENYING DEFENDANT'S
MOTION TO DISMISS

**I**
**INTRODUCTION**

This matter comes before the Court on Defendant Whitepages, Inc.'s Motion to Dismiss under Rules 12(b)(1) and 12(b)(6). Dkt. # 13. The Court has reviewed the materials filed in support of and in opposition to the motion, the record, and the governing law. Being fully advised, for the reasons below, the Court DENIES the motion.

**II**
**BACKGROUND**

The Court takes as true the facts alleged in the complaint, which are outlined below. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Whitepages "operates at least three 'people search' websites: (1) www.whitepages.com; (2) www.peoplesearch.com; and (3) www.411.com." Dkt.

ORDER DENYING DEFENDANT'S MOTION TO
DISMISS - 1

# 1 at 11, ¶ 43. These websites use free-preview profile pages to advertise, among other things, subscriptions to Whitepages Premium, which is hosted on www.whitepages.com. *Id.* at 12, 18, ¶¶ 44, 45, 47, 60. Whitepages has "publish[ed] millions of free-preview 'profile' pages," *id.* at 18, ¶ 60, and optimizes them "to rank highly in search engine results." *Id.* at 72, ¶ 225.

When someone enters an individual's name into a search engine, they may see a free-preview profile page on one of Whitepages' websites that includes that person's "name, job title, employer, age range, home address, and other personally identifying information." *Id.* at 2, 53, 63, ¶¶ 4, 142–43, 185–86. These free-preview profile pages say, for example,[1] "Get Jennifer's Background Report" with a button to "View Background Report" and say, "Get Jennifer's Contact Info" with a button to "View Jennifer's Contact Info." *Id.* at 19–20, ¶ 69. If a visitor clicks "View Jennifer's Contact Info," they are directed to a page that says Jennifer has "5 Cell Phone Numbers," "7 Landline Numbers," "20 Current & Past Addresses," "6 Email Addresses," "Criminal & Traffic Records," and "4 Public Records & Properties." *Id.* at 21–22, ¶ 74. The top of the page says, "Get these details and more with Premium" with a button to "Unlock Jennifer's Full Report." *Id.*

If a visitor clicks "Unlock Jennifer's Full Report," they are directed to a page that says, "Unlock Jennifer's information" and provides different subscription tiers for Whitepages Premium. *Id.* at 24, ¶ 77. By paying for a more expensive subscription tier, a visitor can access more information in Whitepages Premium's database. *Id.* According to Whitepages, subscribers to Whitepages Premium "get accurate contact data for more than 250 million people in the U.S.," including "more than 515 million verified email addresses." *Id.* at 12–13, ¶ 49. Subscribers to Whitepages Premium "gain access to a vast database of Americans' personally identifying

---

[1] For the other Plaintiffs' free-preview pages, see Dkt. # 1 at 32–40, ¶¶ 96–106 and *id.* at 43–50, ¶¶ 119–130.

ORDER DENYING DEFENDANT'S MOTION TO
DISMISS - 2

information, including their names, email addresses, phone numbers, physical addresses, employers, and more." *Id.* at 12, ¶ 48. They can also conduct background checks to obtain information about, for example, a person's "criminal history or involvement in civil litigation." *Id.* at 14–15, ¶ 52. Plaintiffs allege that Whitepages "has built and now reaps a significant profit from its Whitepages.com business by trading off of the names, personas, and identities of millions of Americans, without obtaining their consent or providing them compensation of any kind." *Id.* at 18, ¶ 59.

Plaintiffs Jennifer Carrera (a resident of California), Carol Anderson (a resident of Illinois), and Becky Jo Palmer (a resident of Ohio), whose information appears on Whitepages' free-preview profile pages, *id.* at 2, 6, ¶¶ 4, 17–19, filed a class action complaint against Whitepages bringing claims under the Washington Personality Rights Act (WPRA), RCW 63.60.050, the California Right of Publicity Law (CRPL), Cal. Civ. Code § 3344, the Illinois Right of Publicity Act (IRPA), 765 Ill. Comp. Stat. 1075, and the Ohio Right of Publicity in Individual's Persona Act (ORPIPA), Ohio Rev. Code Ann. § 2741.

The Court denied Whitepages' motion to compel arbitration for reasons discussed *infra* Section III.C.1. Dkt. # 38. Whitepages moves to dismiss Plaintiffs' claims. It contends that Plaintiffs lack Article III standing and that, in any event, they do not state claims under the right of publicity statutes. It also asserts that Whitepages' Terms of Service and the Washington, Illinois, and Ohio right of publicity statutes do not allow Plaintiffs to maintain class actions.

### III
### DISCUSSION

In reviewing a motion to dismiss under Rule 12(b)(6), a court takes all well-pleaded factual allegations as true and determines whether the complaint "state[s] a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 678.  Although the court draws all reasonable inferences in favor of the plaintiff, it is not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

A.      Article III Standing

Plaintiffs have standing to bring their claims for damages.[2]

In assessing standing on a motion to dismiss, the Court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Thomas v. Mundell*, 572 F.3d 756, 760 (9th Cir. 2009) (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)).  To satisfy Article III's case or controversy requirement, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief."  *TransUnion*, 594 U.S. at 423 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).  Whitepages asserts only that Plaintiffs do not establish injury in fact.

Whitepages contends that Plaintiffs do not adequately allege injury because they do not aver that third parties viewed their information.  It also contends that even if third parties viewed their information, Plaintiffs suffered no harm because the information was accurate and publicly available.  The Court rejects these contentions.  Plaintiffs sufficiently allege that others viewed

---

[2] Plaintiffs seek both damages and injunctive relief.  Dkt. # 1 at 94–95.  "[A] plaintiff must demonstrate standing separately for each form of relief sought."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 436 (2021) (quotation marks and citation omitted).  In asserting that Plaintiffs lack standing, Whitepages relies heavily on *TransUnion*, which focuses on establishing standing for damages.  *Id.* at 435–37.  Whitepages does not separately contend that Plaintiffs lack standing to pursue injunctive relief.

their free-preview profile pages.  And Whitepages' use of information about Plaintiffs that is accurate and publicly available nonetheless inflicts a harm cognizable under Article III.

      1.     Plaintiffs adequately allege that third parties viewed their free-preview profiles.

Courts have diverged on whether the use of a plaintiff's information to create a free-preview page inflicts an injury in fact even if nobody views the advertisement.[3]  But the Court need not reach this issue because Plaintiffs allege that Whitepages "disseminated" free-preview profile pages, *see, e.g.*, Dkt. # 1 at 18, ¶ 61, and that "numerous non-subscribers to Defendant's services visited each of the Plaintiffs' free-preview 'profile' pages."  *Id.* at 75–76, ¶ 231.  They also allege:

> Upon information and belief, search engine users have placed queries for the names of each of the Plaintiffs and putative class members, obtained results which display links to the respective free-preview "profile" pages corresponding to each of Plaintiffs and the putative class members, clicked on those links, and *borne witness to the advertisements published by Defendant* which misappropriate Plaintiffs' and the putative class members' names, identities, personas, and other personally identifying information as described herein.

*Id.* at 77, ¶ 235 (emphasis added).

Whitepages counters that pleadings on "information and belief" need not be taken as true. But the cases it cites are unpersuasive here.  In *Loffman v. California Dep't of Educ.*, 119 F.4th 1147, 1161 (9th Cir. 2024), the Ninth Circuit did not take as true an allegation that a school meets California's requirements to be certified as a nonpublic school by relying on *Iqbal*, which holds that "formulaic recitation of the elements" of a legal claim "are conclusory and not entitled to be assumed true."  556 U.S. at 681 (citation omitted).  But the allegations that search engine

---

[3] In the months following the *TransUnion* decision, two courts in the Northern District of Illinois reached different conclusions on this issue.  *Compare Lukis v. Whitepages Inc.*, 549 F. Supp. 3d 798, 804–05 (N.D. Ill. 2021), *with Verde v. Confi-Chek, Inc.*, 2021 WL 4264674, at *4–5 (N.D. Ill. Sept. 20, 2021); *see also Hoffower v. Seamless Contacts Inc.*, 736 F. Supp. 3d 605, 612 (N.D. Ill. 2024) (discussing *Lukis* and *Verde*).  Federal district courts in California have also disagreed on this issue.  *Compare Ridgeway v. Spokeo, Inc.*, 697 F. Supp. 3d 979, 984–87 (C.D. Cal. 2023) *with Mannacio v. Information.com LLC*, 2024 WL 4557678, at *3 (N.D. Cal. Oct. 22, 2024).

users viewed Plaintiffs' free-preview profile pages are factual allegations, not a recitation of legal elements. *See Nolen v. PeopleConnect, Inc.*, 2023 WL 4303645, at *9 (N.D. Cal. June 30, 2023) ("Plaintiff's allegations regarding users' searches are specific statements of predicate facts, *not* ultimate facts or legal conclusions.").

And although Whitepages cites *Fruci & Assocs., PS v. A10 Cap. LLC*, 510 F. Supp. 3d 962 (W.D. Wash. 2020), that case undermines, rather than supports, its position. The court in that case explained, "There is nothing inherently objectionable to pleading on information and belief and doing so is often necessary 'where facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that' gives rise to an inference of plausibility." *Id.* at 968 (quoting *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017)). Plaintiffs allege that Whitepages tracks the number of times that non-subscribers view each free-preview profile page. Dkt. # 1 at 76, ¶ 232. Taking this allegation as true, the Court concludes that it is Whitepages, not Plaintiffs, that has greater access to data about the viewership of its free-preview profile pages.

Thus, the Court takes as true Plaintiffs' allegation that third parties viewed their free-preview profile pages.

2. Whitepages' use of accurate and publicly available information about Plaintiffs nonetheless inflicts a cognizable harm under Article III.

Intangible harms are typically cognizable under Article III if they bear "a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion*, 594 U.S. at 425. This "inquiry asks whether plaintiffs have identified a close historical or common-law analogue for their asserted injury," which need not be an "exact duplicate." *Id.* at 424.

1    Whitepages attempts to analogize this case to *TransUnion*, in which a plaintiff brought a

2  class action against TransUnion for alerting a potential creditor that his name matched a name on

3  a government list of people who pose a national security risk. *Id.* at 419–21. Analogizing the

4  claims to common law defamation, the Supreme Court held that some class members whose

5  information was never sent to potential creditors lacked standing because "[t]he mere presence of

6  an inaccuracy in an internal credit file, if it is not disclosed to a third party, causes no concrete

7  harm." *Id.* at 434, 439. But Plaintiffs do not assert an injury under claims analogous to common

8  law defamation. They bring claims under right of publicity statutes that are based on the

9  common-law tort of invasion of privacy, or, more specifically, of appropriation of likeness.[4] *See*

10  *Mannacio*, 2024 WL 4557678, at *3 (similarly distinguishing *TransUnion*); *Kellman v. Spokeo,*

11  *Inc.* (*Kellman II*), 2024 WL 2788418, at *5 (N.D. Cal. May 29, 2024) (same).

12    Whitepages asserts that alleging the elements of right of publicity statutes is not enough

13  to establish standing because "under Article III, an injury in law is not an injury in fact."

14  *TransUnion*, 594 U.S. at 427. To be sure, alleging the violation of a statute does not necessarily

15  satisfy the injury in fact requirement. *Id.* at 426. But not all statutes codify common-law torts.

16  Because these statutes require establishing a harm with a common-law analog, courts have held

17  that plaintiffs who adequately allege such claims establish standing. *See Lukis*, 549 F. Supp. 3d

18  at 805 ("Violations of the IRPA are an easy case under [*TransUnion*]" because the statute

19  codifies the common-law tort of appropriation of likeness); *see also In re Facebook, Inc. Internet*

20

21  ───────────────

[4] *See Aronson v. Dog Eat Dog Films, Inc.*, 738 F. Supp. 2d 1104, 1113 (W.D. Wash. 2010) ("In
22  addition to the common law cause of action, Washington has provided a statutory remedy for
misappropriation of identity under RCW 63.60."); *Hoffower*, 736 F. Supp. 3d at 611–12 ("IRPA codified
23  the common law tort of 'right of publicity,' also known as the 'appropriation of likeness' tort."); *Wilson v.
Ancestry.com LLC*, 653 F. Supp. 3d 441, 453 (S.D. Ohio 2023) ("Ohio's codified right of publicity does
not supplant common law invasion of privacy" (citation omitted)); *Callahan v. PeopleConnect, Inc.*, 2021
24  WL 5050079, at *15 (N.D. Cal. Nov. 1, 2021) (the CRPL "fill[ed] a gap which existed in the common
law tort of invasion of privacy" (cleaned up)).

*Tracking Litig.*, 956 F.3d 589, 598 (9th Cir. 2020) ("Thus, these statutory provisions codify a substantive right to privacy, the violation of which gives rise to a concrete injury sufficient to confer standing."). And although some right of publicity statutes are based on, rather than directly codify, the common-law tort of appropriation of likeness, the Ninth Circuit has recognized that "a violation of the common law right to privacy" can constitute an injury in fact. *See Phillips v. U.S. Customs & Border Prot.*, 74 F.4th 986, 993 (9th Cir. 2023).

Under the Restatement Second of Torts (Restatement) § 652C, "One who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy." This common-law claim protects "the interest of the individual in the exclusive use of his own identity, in so far as it is represented by his name or likeness, and in so far as the use may be of benefit to him or to others." *Id.* § 652C, cmt. a. It is unclear whether the injury caused by appropriation of likeness is "a direct wrong of a personal character resulting in injury to the feelings," *Mannacio*, 2024 WL 4557678, at *3 (quoting *Miller v. Collectors Universe, Inc.*, 72 Cal. Rptr. 3d 194, 204 (Cal. Ct. App. 2008)), or "of an economic or material nature." *See Motschenbacher v. R. J. Reynolds Tobacco Co.*, 498 F.2d 821, 824–25 (9th Cir. 1974). But Plaintiffs' allegations that Whitepages uses their personal information in free-preview pages to sell more information about them establish an injury recognized under either formulation of the harm, which have common-law analogs. *See Kellman II*, 2024 WL 2788418, at *5.

Under the first formulation of the harm, Plaintiffs need not allege emotional distress to satisfy injury in fact, although Carrera does so. Dkt. # 1 at 31–32, ¶ 92; *see infra* Section III.B.4. The harm caused by appropriation of likeness can be inferred from allegations that Whitepages violates Plaintiffs' "right to control their identities," which is distinct from "mental and emotional harm." *See Kellman II*, 2024 WL 2788418, at *5; *see also Kellman v. Spokeo, Inc.*

ORDER DENYING DEFENDANT'S MOTION TO
DISMISS - 8

*(Kellman I)*, 599 F. Supp. 3d 877, 889 (N.D. Cal. 2022) ("Controlling one's likeness was the essence of the right at common-law.") (citing *In re Facebook*, 956 F.3d at 598).  And Whitepages cites no authority suggesting that a common-law claim for appropriation of likeness requires dissemination of erroneous information about a plaintiff, nor is the Court aware of any such authority.

Under the second formulation of the harm, Whitepages relies on *Callahan v. Ancestry.com Inc. (Callahan I)*, 2021 WL 783524, at *4–5 (N.D. Cal. Mar. 1, 2021), which was decided before *TransUnion*, to contend that the use of publicly available information to solicit paying subscribers is not enough to cause injury in fact.  But this contention is unpersuasive because the right of publicity contemplates appropriation of public information:

> No one has the right to object merely because his name or his appearance is brought before the public, *since neither is in any way a private matter and both are open to public observation.* It is only when the publicity is given for the purpose of appropriating to the defendant's benefit the commercial or other values associated with the name or the likeness that the right of privacy is invaded.

Restatement § 652C, cmt. d (emphasis added).  The use of public information can cause an injury in fact when it unjustly enriches a defendant.  *See Kellman I*, 599 F. Supp. 3d at 890 (distinguishing the reasoning in *Callahan I*, 2021 WL 783524 as reiterated in *Callahan v. Ancestry.com Inc. (Callahan II)*, 2021 WL 2433893, at *3 (N.D. Cal. June 15, 2021)); *see also Bonilla v. Ancestry.com Operations Inc.*, 574 F. Supp. 3d 582, 591 (N.D. Ill. 2021) (similar).  And Plaintiffs plausibly allege that Whitepages is unjustly enriched by profiting from the sale of their information.

The Court rejects Whitepages' contentions to the contrary.  Whitepages suggests that Plaintiffs must bring an unjust enrichment claim to establish standing based on this formulation of harm, but some class members in *TransUnion* established standing under a theory of harm based on common law defamation even though they brought claims under a federal statute.  594

ORDER DENYING DEFENDANT'S MOTION TO
DISMISS - 9

U.S. at 431–32.  Whitepages notes that "the harm alleged here is not particularized" because the economic value at issue "is not in any particular person's name; the value is in the database of names and the ability to look up *any* name in a database to get the requisite information."  Dkt. # 13 at 16 n.7.  Whitepages, however, cites no authority suggesting that when a defendant sells a database, each piece of information in the database lacks value.  Whitepages also says that because the free-preview profile pages say, for example, "Unlock Jennifer's Full Report," there is no injury because "Jennifer" is not traceable to Plaintiff Carrera.  Dkt. # 13 at 13 (citing Dkt. # 1 at 22–23, ¶ 75).  But another screenshot with the "Unlock Jennifer's Full Report" button says "Jennifer Carrera" and includes her age, location, where she used to live, and to whom she is related.  Dkt. # 1 at 21–22, ¶ 74.

        Thus, Plaintiffs have Article III standing.

B.      Right of Publicity Statutes

        Plaintiffs adequately allege violations of the WPRA, IRPA, ORPIPA, and CRPL.

        1.      Washington Personality Rights Act

        Whitepages contends that Plaintiffs do not state a WPRA claim because its use of their information falls under two exemptions for "merely descriptive" or "insignificant, de minimis, or incidental use."  RCW 63.60.070(5)–(6).  Whitepages says that because its free-preview profile pages are a sample of the kind of information that would be accessible if someone subscribes to Whitepages Premium, its use of Plaintiffs' information is merely descriptive or incidental.  This contention is unpersuasive under the plain language of the statute and recent caselaw.

        "[M]erely descriptive" use of someone's information alone is not enough to fall under the exemption in RCW 63.60.070(5), which has additional requirements:

> This chapter does not apply to a use or authorization of use of an individual's or personality's name that is *merely descriptive* **and** *used fairly and in good faith only to identify or describe something other than the individual or personality*, such as,

without limitation, to describe or identify a place, a legacy, a style, a theory, an ownership interest, or a party to a transaction or to accurately describe the goods or services of a party.

(emphasis and bold added).  Granted, it is a close question whether this exception applies because "the individual names only [appear] in example profiles."  *LaRock v. ZoomInfo Techs. LLC*, 2025 WL 1345264, at *2 (W.D. Wash. May 8, 2025).  But it is plausible at this stage that Whitepages' nonconsensual use of Plaintiffs' information is not in "good faith" and that Whitepages Premium, while a "service" providing information about Plaintiffs, is not "something other than the individual or personality."

And although the WPRA exempts "insignificant, de minimis, or incidental use," Plaintiffs allege that Whitepages' use of their information "was instrumental (and continues to be instrumental) to Defendant in obtaining paying customers to its web-based platform," which is supported by Whitepages' use of numerous free-preview profile pages and its "optimization of these pages to rank highly in search engine results."  Dkt. # 1 at 84–85, ¶ 264.  Courts considering similar allegations have held that they could show non-incidental use.  *See LaRock*, 2025 WL 1345264, at *3 (collecting cases).

Thus, Plaintiffs state a claim under the WPRA.

### 2.    Illinois Right of Publicity Act

Whitepages asserts that Anderson does not state a claim under the IRPA because she does not adequately allege that her identity was used for a commercial purpose.  The IRPA defines commercial purpose as "the public use or holding out of an individual's identity (i) on or in connection with the offering for sale or sale of a product, merchandise, goods, or services; (ii) for purposes of advertising or promoting products, merchandise, goods, or services; or (iii) for the purpose of fundraising."  765 Ill. Comp. Stat. 1075/5.  Whitepages relies on *Dobrowolski v. Intelius, Inc.*, 2018 WL 11185289, at *3 (N.D. Ill. May 21, 2018), which holds that when a

ORDER DENYING DEFENDANT'S MOTION TO
DISMISS - 11

1  plaintiff's identity is "not used to promote a separate product" but is instead "part of the product

2  offered for sale," the use of the plaintiff's identity to promote the product is not for a commercial

3  purpose under the IRPA.  *Id.*

4       The Court joins courts that have rejected *Dobrowolski*'s "'separate product' requirement

5  and held that the use of a plaintiff's identity in connection with a free preview to advertise or

6  promote a monthly subscription service is a 'textbook example' of an IRPA violation."  *Green v.*

7  *Datanyze, LLC*, 2024 WL 168123, at *2 (N.D. Ill. Jan. 16, 2024) (collecting cases).  As courts

8  have recognized, "[t]he plain text of the IRPA does not support imposing such a requirement."

9  *Id.* at *3.  To the contrary, the IRPA's definition of commercial purpose as holding out an

10  individual's identity "on or in connection with the offering for sale or sale of a product" suggests

11  that it includes circumstances in which a defendant uses a plaintiff's identity to sell information

12  about that plaintiff.  *See Kellman I*, 599 F. Supp. 3d at 892 (observing in dicta).

13       Even if there were a separate product requirement, Whitepages Premium is a distinct

14  product because it gives subscribers access not only to Anderson's information, but also to a

15  "vast searchable database" of other individuals' "personally identifying information and related

16  products and services."  Dkt. # 1 at 89, ¶ 283.  Because Anderson's personal information is only

17  some of the information that subscribers can access through Whitepages Premium, the database

18  is plausibly a separate product.  *See Green*, 2024 WL 168123, at *2 (distinguishing *Dobrowolski*

19  because "the plaintiffs [in *Dobrowolski*] alleged that their identities were being sold as

20  standalone products rather than as part of a subscription that included a range of other content.").

21       Whitepages also relies on *Bohnak v. Trusted Media Brands, Inc.*, 2023 WL 2691620

22  (S.D.N.Y. Mar. 29, 2023).  But in *Bohnak*, the plaintiffs' IRPA claim was based on the

23  defendant's direct sale of their personal information to third parties.  *Id.* at *3.  The plaintiffs did

24  not, as here, allege that their identities were used in advertisements to entice the sale of their

ORDER DENYING DEFENDANT'S MOTION TO
DISMISS - 12

personal information.  *See Huston v. Hearst Commc'ns, Inc.*, 53 F.4th 1097, 1100 (7th Cir. 2022) ("What distinguishes this case from the background report cases—and is outcome determinative—is that Huston did not allege that Hearst solicited mailing list purchasers by publicizing her information.").

Thus, Anderson states a claim under the IRPA.

3.     Ohio Right of Publicity in Individual's Persona Act

Whitepages asserts that Palmer does not state a claim under the ORPIPA because its use of her information is merely incidental.  It cites *Hudson v. Datanyze, LLC*, 702 F. Supp. 3d 628, 632 (N.D. Ohio 2023),[5] which relies on *Vinci v. Am. Can Co.*, 591 N.E.2d 793 (Ohio Ct. App. 1990).  In *Vinci*, Charles Vinci, an Olympic gold medalist, alleged that the defendants used the names of various athletes (including his) on a series of promotional disposable drinking cups under a partnership between Minute Maid Corporation and the United States Olympic Committee.  591 N.E.2d at 793–94.  The Court of Appeals of Ohio relied on a Supreme Court of Ohio case citing a draft of the Restatement, which provides:

> Incidental use of name or likeness. The value of the plaintiff's name is not appropriated by mere mention of it, or by reference to it in connection with legitimate mention of his public activities; nor is the value of his likeness appropriated when it is *published for purposes other than taking advantage of his reputation, prestige, or other value associated with him*, for purposes of publicity.

*Id.* at 794 (quoting *Zacchini v. Scripps-Howard Broad. Co.*, 351 N.E.2d 454, 458 n.4 (Ohio 1976), *rev'd and remanded*, 433 U.S. 562 (1977)) (quotation marks omitted) (emphasis added). In a divided opinion, the Court of Appeals of Ohio affirmed the trial court's grant of summary judgment against Vinci because "the mention of the athletes' names within the context of accurate, historical information was incidental to the promotion of the Dixie Cups."  *Id.* at 793–

---

[5] The Sixth Circuit affirmed this decision in an unpublished opinion that does not discuss incidental use.  *See Hudson v. Datanyze, LLC*, 2025 WL 80806 (6th Cir. Jan. 13, 2025).

ORDER DENYING DEFENDANT'S MOTION TO
DISMISS - 13

94.  The court in *Hudson* held that central to *Vinci*'s holding was "a determination that the use of plaintiffs' likenesses was clearly not an endorsement of the product."  702 F. Supp. 3d at 632. Applying *Vinci* to allegations like those presented here, the court in *Hudson* concluded that the plaintiffs did not state an ORPIPA claim because the publication of the plaintiffs' information at issue did not imply that they "use, support, or promote the product."  *Id.* at 634–35.

    But *Vinci* is distinguishable because it did not involve the sale of the plaintiff's information.  The incidental use exception applies when the *use* of a plaintiff's name or likeness is incidental to the *purpose* of that use.  *See Hudson*, 702 F. Supp. 3d at 633 (defining incidental use).  As the draft of the Restatement quoted in *Vinci* further explains:

> It is only when the publicity is given for the *purpose* of appropriating to the defendant's benefit the commercial or other values associated with the name or the likeness that the right of privacy is invaded. The fact that the defendant is engaged in the business of publication, for example of a newspaper, out of which he makes or seeks to make a profit, is not enough to make *the incidental publication* a commercial use of the name or likeness.

591 N.E.2d at 794 (quoting *Zacchini*, 351 N.E.2d at 458 n.4) (emphasis added).  In *Vinci*, the defendants' use of the plaintiff's name was incidental to the purpose of selling disposable cups because multiple athletes were mentioned, the information was widely known, and the product itself was not directly connected to or endorsed by the athletes.  By contrast, Whitepages features Palmer individually on a free-preview profile page, advertises personal information that is not widely known, and sells access to more information about her.  Taking Palmer's allegations as true, it is plausible that Whitepages' use of her information is not incidental.  *See infra* Section III.B.4 (California courts have denied motions to dismiss on incidental use grounds because such dismissals would be premature).

    In *Wilson*, an Ohio federal district court similarly distinguished *Vinci*.  *See* 653 F. Supp. 3d at 454–56 (distinguishing *Vinci* in holding that the plaintiff adequately alleged that his name

and likeness had commercial value and applying the same reasoning to incidental use).

Although the court in *Hudson*, 702 F. Supp. 3d at 633 (also an Ohio federal district court),

rejected the reasoning in *Wilson* because it relies on out-of-circuit district court decisions that do

not apply Ohio law, the Court nonetheless concludes that *Vinci*—a primary case on which the

*Hudson* court's incidental use analysis rests—is distinguishable.  The Court also concludes that

neither of the two other Ohio state court decisions relied on by the *Hudson* court are on point.

In *Zacchini*, the plaintiff performed a "human cannonball" act in which he was shot out

of a cannon.  351 N.E.2d at 455 (syllabus).  After a television station broadcast a clip of the

performance that was filmed without his consent, the plaintiff sued for invasion of privacy.  *Id.* at

455–56 (syllabus).  Contrary to the *Hudson* court's observation, the Supreme Court of Ohio did

not, at least expressly, hold that the broadcasting of the "human cannonball" was incidental use.

702 F. Supp. 3d at 633–34.  The Supreme Court of Ohio assumed that the plaintiff had a right of

publicity in his performance but held that the television station had a privilege to report on it.

*Zacchini*, 351 N.E.2d at 460–62.  It may be that, as with the example stated above in the

Restatement, the television station's broadcasting of the "human cannonball" act was incidental

use because its purpose was not to benefit from the plaintiff's likeness but from "report[ing]

matters of legitimate public interest."  *Id.* at 461.  If so, this is distinguishable because

Whitepages directly seeks to benefit from selling information about Palmer.

In *Harvey v. Sys. Effect, LLC*, the Court of Appeals of Ohio held that use of the plaintiff's

name in an online real-estate continuing education course was incidental because she "was

mentioned in only three slides of a 200-page presentation."  154 N.E.3d 293, 298, 307 (Ohio Ct.

App. 2020), *abrogated on other grounds by Weidman v. Hildebrant*, 254 N.E.3d 2 (Ohio 2024).

Whitepages suggests that because Whitepages Premium includes access to information about a

vast number of individuals and not just to information about Palmer, the use of her information

ORDER DENYING DEFENDANT'S MOTION TO
DISMISS - 15

in a free-preview profile page is similarly incidental. But again, the incidental use exception applies when the *use* of a plaintiff's name or likeness is incidental to the *purpose* of that use. That the plaintiff in *Harvey*'s name was mentioned in only three out of 200 slides is indicative of the fact that the defendant's purpose in using her name was not to benefit from the value of her name. More importantly, however, the defendant used her name to add information to an online real-estate continuing education course. Because Palmer alleges that Whitepages used her information to sell more information about her, the fact that her information only comprises a part of Whitepages Premium's database is insignificant. As the Supreme Court of Ohio recognized in *Zacchini*, "the fundamental wrong is the appropriation for one's self of the benefits of another's name, likeness, or identity." 351 N.E.2d at 458. Applying the incidental use exception to the circumstances alleged here would allow multiple wrongs to create a right; a defendant would be exempt from liability when they appropriate numerous identities, rather than just one. Palmer adequately alleges a claim under the ORPIPA because unlike the educational course in *Harvey* or the disposable cups in *Vinci*, Whitepages Premium's database includes information about her.[6]

---

[6] The Court of Appeals of Ohio recently considered incidental use in *Imperial Aviation Servs. LLC v. Ohio State Univ.*, 252 N.E.3d 185 (Ohio Ct. App. 2024). But this case is also distinguishable. There, the defendant Ohio State University (OSU) posted information on social media about services provided at an airport it owned. *Id.* at 188. This post referred to the plaintiff Imperial Aviation (an entity providing aircraft cleaning services) and included an image of Carlos Muller (also a plaintiff and owner of Imperial Aviation) cleaning an airplane. *Id.* OSU's airport also wrote two news articles about student capstone projects that included information about Imperial Aviation and Muller, who sponsored a project at OSU's Center for Aviation Studies. *Id.* at 188–89.

The Court of Appeals of Ohio held, "No reasonable person could find that the usage of Muller's likeness, as a person cleaning an airplane, on OSU social media posts was more than incidental to the informational purpose of those posts," and that "references to Muller and Imperial Aviation in the[] [news] articles reasonably only can be considered incidental to the purpose of publishing information about the capstone program." *Id.* at 195. Unlike OSU, which used the plaintiffs' information to provide information about its airports' services and the capstone program, Whitepages allegedly uses plaintiffs' information to sell more information about them, thus appropriating their identities for its benefit.

To be sure, Ohio has an incidental use exception that may not apply under other states' right of publicity laws.  A recent Ohio federal district court case examining the incidental use exception involved PropertyShark, a property research website that sells subscriptions for access to information about commercial residential properties (e.g., "ownership details, property values, and sales history").  *LaFleur v. Yardi Sys., Inc.*, 765 F. Supp. 3d 640, 643–44 (N.D. Ohio 2025), *appeal docketed*, No. 25-3172 (6th Cir. Mar. 14, 2025).  The plaintiffs, whose names were included in reports about their properties, brought an ORPIPA claim.  *Id.* at 645–46.  In dismissing this claim, the court explained:

> Plaintiffs allege only that the visitors to PropertyShark "have viewed information on" Plaintiffs, but that information consists of no more than their name and an accurate, historical record of their real estate ownership information. Just as the defendants in *Vinci* placed Vinci's name and achievements on their Dixie Cups to market their product, Yardi places Plaintiffs' name and publicly accessible property information on property reports to "entic[e] users to commit to monthly or yearly subscriptions" to PropertyShark.

*Id.* at 661 (citations omitted).  Unlike Whitepages Premium, the product sold in *LaFleur* was not primarily based on information about the plaintiffs themselves, but on information about the properties they owned.  Although "Ohio employs a relatively 'narrow' construction of the right of publicity," *id.* at 660–61 (quoting *Hudson*, 702 F. Supp. 3d at 634), *Vinci* and other cases on which this narrow construction rests, do not hold that use of a plaintiff's personal information to sell more information about them is incidental use exempt from liability.

Thus, Palmer states a claim under the ORPIPA.

4.      California Right of Publicity Law

Whitepages asserts that Carrera does not state a claim under the CRPL because (1) she does not allege that Whitepages used her information to advertise a separate product; (2) she

alleges only that Whitepages' use of her information is incidental; and (3) she does not sufficiently plead mental anguish.[7]  None of these assertions are persuasive.

First, Whitepages relies on *Brooks v. Thomson Reuters Corp.*, 2021 WL 3621837, at *4 (N.D. Cal. Aug. 16, 2021), for the proposition that Plaintiffs cannot state a CRPL claim when "the product *is* their name, likeness, and personal information."[8]  But *Brooks* is distinguishable. In *Brooks*, the plaintiffs brought a claim under the California common law right of publicity[9] against Thomson Reuters, which sold dossiers of individuals without their consent through an online platform called CLEAR.  *Id.* at *1–2.  Because the plaintiffs did not allege that Thomson Reuters used their information "to advertise or promote the CLEAR platform," the court concluded that they did not state a common law right of publicity claim.  *Id.* at *5.  But here, Carrera alleges that Whitepages uses her information in free-preview profile pages to advertise Whitepages Premium.  Dkt. # 1 at 19–21 ¶¶ 69, 71.

To the extent that *Brooks* requires a plaintiff bringing a CRPL claim to allege that their name or likeness is used to promote a separate product, later decisions in the Northern District of California and elsewhere have rejected such a requirement.  *See Spindler v. Seamless Contacts, Inc.*, 2022 WL 16985678, at *5 (N.D. Cal. Oct. 24, 2022); *Wallen v. Consumer Reps., Inc.*, 2022 WL 17555723, at *3–4 (S.D.N.Y. Dec. 9, 2022) (citing *Comedy III Prods., Inc. v. Gary Saderup,*

---

[7] Whitepages also says that Carrera does not adequately allege "a knowing use" of her information as required under California law.  *Caraccioli v. Facebook, Inc.*, 167 F. Supp. 3d 1056, 1067 (N.D. Cal. 2016).  But Plaintiffs allege that Whitepages knows that it uses their information and that it has settled a lawsuit based on the same conduct.  *See* Dkt. # 1 at 77, ¶ 236 & n.31.

[8] Whitepages also suggests that Carrera does not state a CRPL claim because, unlike the plaintiffs in *Brooks*, she does not allege that Whitepages advertised inaccurate information about her.  Dkt. # 13 at 28 (citing 2021 WL 3621837, at *1).  But Whitepages does not cite authority showing that advertisement of inaccurate information is an element under the CRPL.

[9] To state a CRPL claim, a plaintiff must plead all the elements of a common law right to publicity claim.  *Brooks*, 2021 WL 3621837, at *2.

*Inc.*, 21 P.3d 797, 802 (Cal. 2001)).  The plain text of the CRPL undermines, rather than

supports, the notion that there is a separate product requirement.  It provides:

> Any person who knowingly uses another's name, voice, signature, photograph, or
> likeness, in any manner, *on or in* products, merchandise, or goods, or for purposes
> of advertising or selling, or soliciting purchases of, products, merchandise, goods
> or services, without such person's prior consent. . . shall be liable.

Cal. Civ. Code § 3344(a) (emphasis added).  Because the CRPL covers use of a plaintiff's

information *in* a product, it does not have a separate product requirement.

Second, Whitepages contends that it cannot be liable because its use of Carrera's

information is merely incidental.  "[T]o assess whether a use is merely 'incidental,' courts have

considered '(1) whether the use has a unique quality or value that would result in commercial

profit to the defendant; (2) whether the use contributes something of significance; (3) the

relationship between the reference to the plaintiff and the purpose and subject of the work; and

(4) the duration, prominence or repetition of the name or likeness relative to the rest of the

publication.'"  *Spindler*, 2022 WL 16985678, at *5 (quoting *Davis v. Elec. Arts Inc.*, 775 F.3d

1172, 1180 (9th Cir. 2015)).  Whitepages says that Carrera does not allege that its business

model "depends on" its use of her information.  Dkt. # 27 at 17 (quoting *Kellman I*, 599 F. Supp.

3d at 895).

But Carrera alleges that Whitepages uses her personal information on a free-preview

profile page to advertise subscriptions to Whitepages Premium, which gives subscribers access

to more information about her.  Dkt. # 1 at 19–21, ¶¶ 69–72.  Thus, it is plausible that

Whitepages' uses her name to generate a profit.  And because a user who clicks "View Jennifer's

Contact Info" is directed to a page that says, "Get these details and more with Premium," *id.* at

21–22, ¶ 74, there is a direct relationship between the reference to Carrera's information and the

product being sold.  Although Carrera's information is only part of Whitepages Premium's

1  database, she plausibly alleges that the incidental use defense does not apply for the reasons

2  discussed *supra* Section III.B.3 as to the ORPIPA claim.  *See Spindler*, 2022 WL 16985678, at

3  *5 (denying a motion to dismiss in a case involving similar allegations because assessment of an

4  incidental use defense was "premature"); *Kellman I*, 599 F. Supp. 3d at 895 (same).

5          Finally, Whitepages contends that Carrera does not sufficiently plead mental anguish,

6  which the CRPL requires for minimum statutory damages.[10]  *See Perkins v. Linkedin Corp.*, 53

7  F. Supp. 3d 1222, 1242–45 (N.D. Cal. 2014).  But Carrera satisfies this requirement because she

8  alleges that she "became worried, frustrated, and concerned" after she learned that Whitepages

9  was using her personal information "for its own financial gain."  Dkt. # 1 at 31–32, ¶ 92.

10  Whitepages says that this allegation is "rote," but offers no authority suggesting that the Court

11  should not take this factual allegation as true.[11]  Dkt. # 13 at 29.

12          Thus, Carrera states a claim under the CRPL.

13  C.     Class Allegations

14          Whitepages' Terms of Service and the right of publicity statutes do not bar Plaintiffs'

15  class claims.

16          1.      Whitepages' Terms of Service

17          Whitepages asserts that Plaintiffs waived their rights to bring class claims by agreeing to

18  its Terms of Service, which contains a class action waiver.  Whitepages includes a link to the

19  Terms of Service in its motion.  Dkt. # 13 at 29.  Even if the Court considered matters outside the

20  pleadings, *see* Fed. R. Civ. P. 12(d), Whitepages does not show that Plaintiffs agreed to its Terms

21

22

23

24

---

[10] Carrera seeks minimum statutory damages.  Dkt. # 1 at 88, ¶ 278.

[11] Whitepages refers to Section III.C.4 of its motion, but this section does not exist.  If
Whitepages means to refer to Section III.B.3, its reliance on *Martinez v. ZoomInfo Techs. Inc.*, 2022 WL
1078630, at *5 (W.D. Wash. Apr. 11, 2022), is misplaced.  Whitepages says that the plaintiff in *Martinez*
alleged with more specificity the conduct that caused her mental anguish and why such conduct affected
her.  But the plaintiff in *Martinez*, like Carrera, alleged, for example, that she was "deeply uncomfortable
in the knowledge that ZoomInfo is using her name and persona in advertisements."  *Id.*

ORDER DENYING DEFENDANT'S MOTION TO
DISMISS - 20

of Service.  Whitepages says that merely visiting its website is enough for Plaintiffs to agree to its terms.  But it relies on *Patrick v. Running Warehouse, LLC*, 93 F.4th 468, 477 (9th Cir. 2024), which holds that browsewrap agreements are valid when a reasonably prudent visitor to a website would have seen a conspicuous notice of terms that are provided through a hyperlink.  Whitepages does not show that Plaintiffs had such notice of its Terms of Service.  Nor does it provide evidence to support its assertion that "Plaintiffs—who, either themselves or through their counsel, necessarily must have accessed [Whitepages' websites] to furnish the screenshots in the Complaint."  Dkt. # 13 at 29.

In its reply in support of its motion to compel arbitration, Whitepages included screenshots of its website to show that visitors had notice of its Terms of Service and a declaration stating that someone searched all three Plaintiffs' names on whitepages.com a few days before Plaintiffs filed their complaint.  Dkt. # 38 at 5–6.  The Court explained that even if it considered the evidence presented for the first time in a reply brief, it would nonetheless deny the motion because the screenshots were not of the same pages shown in the screenshots included in Plaintiffs' complaint and because it could be that Plaintiffs accessed these pages without first viewing the pages providing notice of Whitepages' Terms of Service.  *Id.* at 6–7.  As for the declaration, the Court explained that it could be Plaintiffs' attorneys, rather than Plaintiffs themselves, who accessed the webpages.  *Id.* at 7.  If that were the case, Plaintiffs might not be bound by the Terms of Service because Whitepages did not establish an agency relationship by presenting evidence about the scope of Plaintiffs' agreement with their attorneys.

Thus, Whitepages does not show that Plaintiffs waived their rights to bring class action claims by agreeing to its Terms of Service.

2.      Washington Personality Rights Act

Whitepages contends that Plaintiffs' class action claims under the WPRA must be dismissed because the statute provides that "the individuals or personalities complaining of the use shall not bring their cause of action as a class action." RCW 63.60.070(3). Although Federal Rule of Civil Procedure 23 allows class actions, Whitepages asserts that this rule does not displace the WPRA's class action bar under Justice Stevens's concurrence in *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010).

In a "fractured 4-4-1" decision, the Supreme Court held that Rule 23 displaced a New York law prohibiting class actions in suits seeking penalties or statutory minimum damages. *Id.* at 396, 416; *CoreCivic, Inc. v. Candide Grp., LLC*, 46 F.4th 1136, 1141 (9th Cir. 2022). Justices Scalia and Stevens agreed on a two-step approach: (1) "determining whether the federal and state rules can be reconciled (because they answer different questions)"; and if they cannot, (2) determining whether the federal rule violates the Rules Enabling Act, 28 U.S.C. § 2072(b), which provides, "Such rules shall not abridge, enlarge or modify any substantive right" (or any other federal law). *Shady Grove*, 559 U.S. at 410–11. They disagreed, however, on the second step: how to determine whether a federal rule abridges, enlarges, or modifies a substantive right.

Three justices joined part of Justice Scalia's opinion holding that Rule 23 does not violate the Rules Enabling Act. *Id.* at 395–96. Justice Scalia, relying on *Sibbach v. Wilson & Co.*, 312 U.S. 1, 14 (1941), held that "it is not the substantive or procedural nature or purpose of the affected state law that matters, but the substantive or procedural nature of the Federal Rule." *Shady Grove*, 559 U.S. at 410. Justice Scalia acknowledged that "it is hard to understand how it can be determined whether a Federal Rule 'abridges' or 'modifies' substantive rights without knowing what state-created rights would obtain if the Federal Rule did not exist." *Id.* at 412. Although he expressed doubt about the sufficiency of *Sibbach*'s reasoning that requiring courts

1    to examine state laws on a case-by-case basis would not be administrable, he nonetheless held

2    that he must abide by precedent. *Id.* at 413–14.

3            In a solo concurrence, Justice Stevens observed that the balance Congress struck between

4    applying federal procedural law and state substantive law in diversity cases "requires careful

5    interpretation of the state and federal provisions at issue." *Id.* at 418–20 (Stevens, J.,

6    concurring). And "the application of that balance does not necessarily turn on whether the state

7    law at issue takes the *form* of what is traditionally described as substantive or procedural. Rather,

8    it turns on whether the state law actually is part of a State's framework of substantive rights or

9    remedies." *Id.* at 419 (Stevens, J., concurring). Thus, Justice Stevens reasoned that a federal

10   rule cannot "displace a state law that is procedural in the ordinary use of the term but is so

11   intertwined with a state right or remedy that it functions to define the scope of the state-created

12   right." *Id.* at 423 (Stevens, J., concurring). But he emphasized, "The mere possibility that a

13   federal rule would alter a state-created right is not sufficient. There must be little doubt." *Id.* at

14   432 (Stevens, J., concurring). He agreed that the New York law was procedural because

15   although it was possible to "argue that class certification would enlarge New York's 'limited'

16   damages remedy, such arguments rest on extensive speculation about what the New York

17   Legislature had in mind when it created [the law]." *Id.* at 436 (Stevens, J., concurring) (internal

18   citations omitted).

19           Based on the briefing before it, the Court concludes that even if there were a conflict

20   between Rule 23 and the WPRA's class action bar,[12] Rule 23 displaces the class action bar under

21

22           [12] In *LaRock*, the parties did not dispute that there was a conflict between Rule 23 and the
     WPRA's class action bar. 2025 WL 1345264, at *4. Here, Plaintiffs contend that the WPRA's class
23   action bar only applies where a *single* "use of an individual's or personality's name . . . includes more
     than one individual or personality so identifiable." RCW 63.60.070(3). Plaintiffs point to the class action
     bar's text, which provides that "the individuals or personalities complaining of *the use* shall not bring
24   their cause of action as a class action." *Id.* (emphasis added). Because the Court concludes that Rule 23
     displaces the WPRA's class action bar, it does not address this issue.

ORDER DENYING DEFENDANT'S MOTION TO
DISMISS - 23

either Justice Scalia's or Justice Stevens's approaches.[13]  Whitepages does not dispute that Rule 23 would displace the class action bar under Justice Scalia's approach.  *See LaRock*, 2025 WL 1345264, at *5 (citing *Hamilton v. Wal-Mart Stores, Inc.*, 39 F.4th 575, 584 (9th Cir. 2022)).  It contends, however, that Rule 23 cannot displace the WPRA's class action bar under Justice Stevens's approach because the class action bar is intertwined with state rights and remedies.

The question is a close one.  Unlike the New York law at issue in *Shady Grove*, which was a general class action provision that applied "not only to claims based on New York law but also to claims based on federal law or the law of any other state," 559 U.S. at 432 (Stevens, J., concurring), the WPRA's class action bar is set forth in a section providing exemptions from liability for WPRA claims.  RCW 63.60.070(3).  The legislative history also includes the class action bar under sections involving rights and remedies.  *See* Wash. House Bill Rep., 1998 Reg. Sess. H.B. 1074 at 2–3 (including what would become the class action bar under a section titled "How One Infringes On Another's Right"); Wash. House Bill Rep., 1998 Reg. Sess. E.S.H.B. 1074 at 3 (including the class action bar under a section titled "Remedies").  And the statute limits the right to the individual and those to whom the right is "assigned or licensed," generally through "contract or inter vivos transfer."  RCW 63.60.030(1), 63.60.040(1).

But Whitepages points to no legislative history explaining why the legislature included a class action bar, and the statute does not yield an obvious answer.  Although the WPRA prohibits

---

[13] In *LaRock*, the court recognized a split of authority among district courts in the Ninth Circuit as to which approach applies.  2025 WL 1345264, at *5.  The court adopted Justice Scalia's approach, reasoning that it was most consistent with the Ninth Circuit's application of *Shady Grove* in *Martin v. Pierce Cnty.*, 34 F.4th 1125 (9th Cir. 2022).  *LaRock*, 2025 WL 1345264, at *5.  Later Ninth Circuit decisions, however, continue to recognize *Shady Grove*'s split authority as to the second step of its framework.  *See Casun Inv., A.G. v. Ponder*, 119 F.4th 637, 646–48 (9th Cir. 2024); *CoreCivic, Inc.*, 46 F.4th at 1141 ("[T]he majority opinion [in *Shady Grove*] broke little new ground with respect to the standard for assessing a potential conflict between the federal rules and state law.").  Because the Court concludes that Rule 23 displaces the WPRA's class action ban under either approach, the Court does not decide which is controlling.

ORDER DENYING DEFENDANT'S MOTION TO
DISMISS - 24

a plaintiff from proceeding in a class action, it does not appear to prohibit a group of plaintiffs from proceeding through regular joinder.  And although the statute appears to limit to whom an individual can assign or license their right, it nonetheless contemplates some form of representative action.  *See* RCW 63.60.040(3).  It is therefore at least debatable that the WPRA's class action bar is procedural, rather than substantive.  *See LaRock*, 2025 WL 1345264, at *6 (Rule 23 displaces the WPRA's class action bar under Justice Stevens's approach because the bar appears in the definition of a defense and does not change "the necessary elements of the claim") (quoting *Lindstrom v. Polaris Inc.*, 2024 WL 4275619, at *7 (D. Mont. Sept. 24, 2024)). This is not enough to satisfy Justice Stevens's "high" bar for "finding an Enabling Act problem." *Shady Grove*, 559 U.S. at 432 (Stevens, J., concurring).

Thus, Rule 23 displaces the WPRA's class action bar.

3.    Illinois Right of Publicity Act

Whitepages contends that Anderson's class claims must be dismissed because the IRPA has a class action bar.  But Whitepages acknowledges that the IRPA allows "an individual or his or her authorized representative" to exercise the rights set forth under the IRPA.  765 Ill. Comp. Stat. 1075/20(a)(1).  Whitepages neither explains how the plain text of the IRPA bars class actions nor cites authority concluding that the IRPA contains a class action bar.  It suggests that the IRPA is analogous to other states' consumer protection statutes, but these statutes, unlike the IRPA, have express class action bars.[14]

_____

[14] Assuming that the IRPA contains a class action bar, Whitepages cites two cases examining whether Rule 23 displaces class action bars in other states' consumer protection statutes.  In *Bohen v. ConAgra Brands, Inc.*, 2024 WL 1254128, at *10 (N.D. Ill. Mar. 25, 2024), the court considered Virginia's Consumer Protection Act, which has a section titled "Individual action for damages or penalty."  Va. Code Ann. § 59.1-204.  The court cited a Virginia Supreme Court decision holding, "Virginia jurisprudence does not recognize class actions."  *Bohen*, 2024 WL 1254128, at *10 (quoting *Casey v. Merck & Co.*, 722 S.E.2d 842, 846 (Va. 2012)).  And in *Bearden v. Honeywell Int'l Inc.*, 2010 WL 3239285, at *8 (M.D. Tenn. Aug. 16, 2010), the court considered the Tennessee Consumer

ORDER DENYING DEFENDANT'S MOTION TO
DISMISS - 25

Thus, the IRPA does not prohibit Anderson from bringing class claims.

     4.     Ohio Right of Publicity in Individual's Persona Act

Whitepages asserts that Palmer's class claims must be dismissed because the ORPIPA has a class action bar.  Whitepages contends that the ORPIPA is like Ohio's Consumer Sales Practice Act (OCSPA), which has a class action bar.  OCSPA, however, provides that for certain statutory violations, "the consumer may, *in an individual action*, rescind the transaction or recover the consumer's actual economic damages."  Ohio Rev. Code Ann. § 1345.09(A) (emphasis added).  OCSPA also provides that in certain circumstances, a consumer "may rescind the transaction or recover, *but not in a class action*."  *Id.* § 1345.09(B) (emphasis added).  The only section of the ORPIPA that Whitepages cites, § 2741.06, does not contain such express language and Whitepages cites no authority suggesting that there is an implied class action bar.

Thus, the ORPIPA does not prohibit Palmer from bringing class claims.

**IV**

**CONCLUSION**

For these reasons, the Court DENIES Whitepages' motion to dismiss.

Dated this 30th day of June, 2025.

<br/>

*John H. Chun*
_____
John H. Chun
United States District Judge

---

Protection Act, which allows consumers to "bring an action *individually* to recover actual damages." Tenn. Code Ann. § 47–18–109(a)(1) (emphasis added).